**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Madison Power, a minor, by and through Kelly and Lisa Power, her parents and guardians,<br><br>Plaintiff,<br><br>vs.<br><br>Gilbert Public Schools, *et al.*,<br><br>Defendants. | No. CV 07-2584-PHX-JAT<br><br>**ORDER** |

Pending before the Court is Defendants' Motion for Summary Judgment (Doc. #79). Defendants moved for summary judgment on all remaining claims – the Title IX claims against the Gilbert Public School District and the §1983 claims against all Defendants. For the reasons outlined below, the Court will grant the Motion.

**I. BACKGROUND**

**A. Factual Background**

Plaintiff Madison Power attended Mesquite High School and played on the girls' varsity basketball team during the 2005-2006 season as a sophomore. At that time, Defendant Candice Gonzales was the head coach of the basketball team, and her husband, Defendant Josh Gonzales, was the assistant coach. Over the winter break of that school year,

Madison and five other players rode home from a basketball tournament in a vehicle driven by Mr. Gonzales. During the car ride home, Mr. Gonzales made some comments of a sexual nature.

Mr. Gonzales's comments made Madison uncomfortable, so she discussed them with her parents. Eventually, after receiving advice from Mary Lou Padilla, a teacher at Mesquite High School, Madison reported Mr. Gonazales's comments to the Mesquite administration. Ms. Padilla also reported the comments to Mr. O'Neill, the athletic director at the time. Based on Madison's report, the Gilbert School District ultimately decided not to renew Mr. Gonzales's coaching contract for the 2006-2007 school year.

Madison alleges that the day after she made her report, Ms. Gonzales called the other varsity players and told them that Josh would "never say anything like that." Ms. Gonzales allegedly asked at least one player, Brittany Foster, to report back to her regarding the actions of the Powers family. Madison further claims that after Mr. Gonzales was fired, Ms. Gonzales kept Madison out of basketball activities during the summer of 2006. Ms. Gonzales told a parent that Madison should not have the nerve "to show up in her gym again." Madison did not receive an informational flyer about the 2006 summer programs, but Ms. Gonzales did not send a flyer to anyone.

After the other varsity players found out about Madison's reporting of Mr. Gonzales's behavior, some of the girls allegedly began threatening Madison. During weight training M.S., a member of the varsity team, was heard threatening to be more aggressive toward Madison in practice, and later made a late hit on Madison. Another varsity player wrote on her MySpace page that Madison was a "bitch." On the bus, varsity players would stick their feet up to prevent Madison from walking down the aisle and would occasionally try to trip her. Once, as Madison walked down the hallways of the high school, K.L., another varsity player, pointed at Madison and said, "stupid bitch." On another occasion, several members of the varsity team walked behind Madison and stepped on her flip-flops, almost causing Madison to trip.

For the first time ever, Mesquite conducted closed girls' basketball tryouts for the 2006-2007 season. The windows to the gym were covered. When Ms. Padilla attempted to attend tryouts to provide moral support for Madison, coaches and the principal expressed their displeasure. On the second day of tryouts, Defendant Dominic Marchiando, the principal of Mesquite High School, told Ms. Padilla that tryouts were closed to all staff members other than coaches.

Ms. Gonzales recused herself from the selection process for the 2006-2007 teams. The coaches who selected the teams for that season were: Greg Ream, the new varsity assistant coach; Jim Lavin, the junior varsity head coach; Evelyn Fox, the junior varsity assistant coach; Barbara Smith, the freshman head coach; and Megan Abrams, the freshman assistant coach. Those coaches rotated around the various courts to observe and evaluate each girl. After tryouts, the coaches conferred outside of the presence of Ms. Gonzales regarding the selections. The coaches determined that Madison should play for the junior varsity team.

Madison played on the junior varsity team for the 2006-2007 season and did not suffer harassment from any of the other junior varsity players. Nonetheless, because of her negative experiences with Ms. Gonzales and some of the varsity players, she decided not to try out for the 2007-2008 season.

### B. Procedural Background

Plaintiff filed this suit on December 19, 2007. She filed a First Amended Complaint (Doc. #22) against all Defendants on April 10, 2008. In Count One of the First Amended Complaint, Plaintiff alleged that Defendant Gilbert Public schools knew about Candice Gonzales's and the players' "harassment of and retaliation toward" Plaintiff, but responded with deliberate indifference; thereby violating Title IX of the Educational Amendments of 1972 ("Title IX"). (Doc. #22, p. 9). In Count II, she alleged that the Defendants violated 42 U.S.C. §1983 by depriving her of her constitutional right to equal protection, free speech, substantive due process, and procedural due process, as well as her statutory right to equal

access to education under Title IX.

Defendants moved to dismiss certain claims on April 17, 2008 (Doc. #27). The Court granted the Motion to Dismiss with regard to Plaintiff's §1983 claims against the Defendants based on violations of Title IX and the Equal Protection Clause as well as the Title IX claims against the individual Defendants. (Doc. #34). After the Supreme Court handed down its decision in *Fitzgerald v. Barnstable School Committee*, 129 S.Ct. 788 (2009), the Court invited Plaintiff to file a motion to reconsider the Court's earlier dismissal of her §1983 claims (Doc. #65).

Plaintiff filed her Motion for Reconsideration on February 27, 2009 (Doc. #68). On March 31, 2009, the Court granted the Motion to Reconsider to the limited extent that the Court reversed its earlier holding dismissing Plaintiff's §1983 equal protection claims and reinstated those claims. (Doc. #75.) Defendants filed their pending Motion for Summary Judgment seeking judgment on all remaining claims on June 25, 2009. (Doc. #79.)

**II. LEGAL STANDARD**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c). Thus, summary judgment is mandated, ". . . against a party who fails to make a showing sufficient to establish evidence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Initially, the movant bears the burden of pointing out to the Court the basis for the motion and the elements of the causes of action upon which the non-movant will be unable to establish a genuine issue of material fact. *Id*. at 323. The burden then shifts to the non-movant to establish the existence of material fact. *Id*. The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts" by "com[ing] forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting Fed.R.Civ.P. 56(e)). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Id*. at 247-48. However, in the summary judgment context, the Court construes all disputed facts in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004).

### III. ANALYSIS AND CONCLUSION

Defendants moved for summary judgment on all of Plaintiff's remaining claims – the Title IX claim against the District and the §1983 claims against the individuals. In her response, Plaintiff argued only for her retaliation claims under Title IX and the Equal Protection Clause. She therefore has waived all other claims she may have stated in the First Amended Complaint. *Jenkins v. County of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005)(the plaintiff "abandoned her other two claims by not raising them in opposition to the . . . motion for summary judgment.").

#### A. TITLE IX

Title IX provides: "No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal assistance." 20 U.S.C. §1681(a). Title IX allows for a private right of action against federal fund recipients, i.e., school districts, for gender discrimination in education, but not against school officials, teachers, and other individuals. *Fitzgerald*, 129 S.Ct. at 796. A school district may be liable under Title IX, however, if it acts with deliberate indifference toward discrimination by a school official or teacher or student-on-student discrimination/harassment. *See e.g., Davis v. Monroe County Bd. of Ed.*, 526 U.S. 629, 646-47 (1999); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287-88 (1998). Title IX also encompasses a cause of action for retaliation against a

person who complains of discrimination at an educational institution. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005)("Retaliation is, by definition, an intentional act. It is a form of 'discrimination' because the complainant is being subjected to differential treatment.").

Because Title IX was enacted under the Spending Clause, private actions are available only when funding recipients, such as school districts, had adequate notice that they could be held liable for the conduct at issue. *Davis*, 526 U.S. at 640. School districts are liable for teacher-student or student-student harassment only if the district: 1) had actual knowledge of the harassment and 2) responded to that knowledge with deliberate indifference. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 739 (9th Cir. 2000). The school district's deliberate indifference must, "'at a minimum, cause students to undergo harassment or make them liable or vulnerable to it.'" *Id*. (quoting *Davis*, 526 U.S. at 645).

When the harasser is a fellow student, it may be harder for the plaintiff to prove a school district's liability under Title IX than when the harasser is a teacher or other school official because of control issues. "Deliberate indifference makes sense . . . only where the funding recipient has some control over the alleged harassment. A recipient cannot be directly liable for its indifference where it lacks the authority to take remedial action." *Davis*, 526 U.S. at 644. A district can only be liable if the district exercises substantial control over the harasser and the context in which the known harassment occurs. *Id*. at 645. "Only then can the [district] be said to 'expose' its students to harassment or 'cause' them to undergo it 'under' the [district's] programs." *Id*.

Moreover, to be actionable, the conduct must be so "severe, pervasive, and objectively offensive," that it effectively deprives the victim of access to the educational opportunities or benefits provided by the school. *Id*. at 650. Whether gender-based conduct rises to the level of harassment depends on the surrounding circumstances, expectations, and relationships; including, the ages of the harasser and the victim and the number of individuals involved. *Id*. at 651. The Court must remain mindful that school children may regularly

interact in a manner that adults would find unacceptable. *Id*. In the school setting:

> [S]tudents often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it. Damages are not available for simple acts of teasing and name-calling among school children, however, even where these comments target differences in gender. Rather, in the context of student-on-student harassment, damages are available only where the behavior is so severe, pervasive and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect.

*Id*. at 651-52.

The Court also stresses that it will not act as a Super-Administrator and second guess the disciplinary actions of a school. Schools must retain sufficient flexibility to make their own disciplinary decisions. *Id*. at 648. A school district's response to reported harassment will be deemed "deliberately indifferent" only if the district's response to the harassment or lack thereof is clearly unreasonable in the light of known circumstances. *Id*. The Court may determine as a matter of law whether a school's response was clearly unreasonable. *Id*. at 649.

Plaintiff has made a claim against the Gilbert School District for retaliation under Title IX. The Court therefore must analyze whether the District had actual knowledge of retaliation against Madison that was within the District's ability to control and, if so, whether the District's response to the reported retaliation was clearly unreasonable.

This case arises from Madison's report of in appropriate comments of a sexual nature by Mr. Gonzales. After investigating Madison's allegations, the District decided not to renew Mr. Gonzales's coaching contract. Mrs. Gonzales felt that Madison had gotten her husband fired and, as a result, allegedly retaliated against Madison.

Madison has alleged that Mrs. Gonzales attempted to garner support for Mr. Gonzales among the other varsity players by making statements, like, "Josh would never say something like that." Also, after Josh was fired, Mrs. Gonzales told another mother, with regard to summer of 2006 basketball activities, that Madison better not have the nerve "to show up in her gym again."

Madison claims that Mrs. Gonzales kept her out of basketball activities during the summer of 2006, but Madison also testified that one of the reasons she did not attend activities is because she did not receive an informational flyer. Mrs. Gonzales, however, did not send out informational flyers to any of the varsity players. Madison also seems to suggest that she did not make the varsity team for the 2006-2007 basketball season because of the Josh situation. But the District has offered undisputed evidence that Mrs. Gonzales did not take part in the selection of teams for the 2006-2007 season. In addition, both Dr. Allison and Dr. Barrett personally attended the tryouts to monitor them for fairness.

The District did not ignore Mrs. Gonzales's conduct. Both Dr. Allison and Mr. Scanio spent many hours meeting with Madison, her parents, and Mrs. Gonzales trying to resolve the situation. Dr. Allison ultimately found sufficient grounds existed to discipline Mrs. Gonzales. He issued her a letter of reprimand for lack of judgment and unprofessional behavior, which remains in her personnel file to this day. The letter informed Mrs. Gonzales that any further incident would result in additional discipline, up to and including her dismissal.

The Court will not second guess the District's decision not to take more drastic disciplinary measures against Mrs. Gonzales. The Court finds that the District's investigation into the claims against Mrs. Gonzales and its ultimate action with regard to her were not clearly unreasonable. The District did not act with deliberate indifference toward Madison's allegations against Mrs. Gonzales.

As stated earlier, it may be more difficult to prevail on a student-on-student harassment claim because of a school district's inability to control the harasser or the setting of the harassment and the tendency of school children to act and speak in ways that adults consider inappropriate. Madison has alleged several incidents of retaliation by her peers: one of the other players was overheard threatening to be more rough with Madison and later that player committed a "hard foul" against Madison at practice; a player wrote on her MySpace page that Madison was a "bitch"; varsity players would stick their legs out in front of

Madison as she attempted to walk down the bus aisle; a varsity player pointed to Madison as she was walking down the hall in school and said, "bitch"; and, one day, some varsity players followed behind Madison as she walked down the hall and stepped on the back of her flip flops.

With regard to the threats made about Madison,[1] the District tasked Garrett Tinsdale, the school resource officer, with investigating the threats. Officer Tinsdale met with Cori Haws and Melissa Spaich about their alleged threats. The girls admitted they were upset with Madison over Josh's firing, but denied they had said anything to her. Officer Tinsdale told the girls that the school had made the decision to fire Josh, not Madison. Officer Tinsdale concluded that no sufficient evidence existed for formal charging. Melissa Spaich also allegedly made a "hard foul" against Madison at practice. The School District certainly would have a hard time monitoring and disciplining for isolated "hard fouls" in sports.

Madison has introduced evidence that one of the varsity players called her a "bitch" on that player's MySpace page. But the District cannot exercise control over what students post on web site from a private computer and therefore could not have disciplined the player for her post. Nonetheless, Mrs. Gonzales met with the player at issue after the post and told her that she needed to move on from any bad feelings toward Madison for the firing of Mr. Gonzales.

Madison has alleged that the varsity players would stick their legs in front of her on the bus. The District has not denied that this incurred. While the leg blocking was definitely obnoxious teenage behavior, the Court does not think that behavior is severe enough to rise to the level of harassment.

Madison alleges that a student called her a "bitch" at school. Mr. Scanio questioned the student at issue, but she denied having used that word. Mr. Scanio told the student's parents about the report and advised that student that she could be disciplined if she did not

---

[1] Madison has presented no evidence that any of the girls made threats to her face.

keep her distance from Madison.

Mr. Scanio also investigated the alleged flip-flop incident. When he questioned the students who allegedly stepped on Madison's flip-flops, they denied having done it. Mr. Scanio checked to see if any of the school's security cameras caught the alleged incident on tape, but found nothing. He nonetheless advised the students that they too could be disciplined if they did not stay away from Madison and again notified their parents.

The Court sympathizes with Madison and understands why she would find her fellow students' behavior toward her upsetting. Teenagers certainly can be very cruel. However, the Court does not find that the students' behavior was so "severe, pervasive, and objectively offensive," that it effectively deprived Madison access to her school's educational opportunities or benefits.

But even if the students' behavior rose to the level of actionable harassment or retaliation, the Court finds as a matter of law that the District's response to the alleged retaliation was not clearly unreasonable given the circumstances. The District diligently investigated the complaints against Mrs. Gonzales and the female students. The District meted out punishment, namely warnings, that it found appropriate in light of its investigations. While the District certainly could have punished both Mrs. Gonzales and some of the students more severely, the Court will not second guess the District's decisions given the reasonableness of the District's response to the situation. Madison has not demonstrated that the District reacted to her complaints with deliberate indifference. The Court therefore grants summary judgment to the District on Plaintiff's Title IX retaliation claims.

### B. §1983 - Equal Protection

Madison claims that the District and the individual Defendants violated her constitutional right to equal protection by retaliating against her for reporting Mr. Gonzales's inappropriate sexual remarks. She makes this claim under 42 U.S.C. §1983, which provides in relevant part that "[e]very person who, under color of [state law,] subjects . . . any . . .

person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ."

Madison cites to *Fitzgerald v. Barnstable* for the proposition that Title IX does not preclude §1983 claims for violations of the Equal Protection Clause occurring at educational institutions. She further states, "[G]iven the close relationship between Title IX and Title VII noted above, the same standards governing sexual harassment and retaliation under Title IX also control the constitutional violations in this matter." Madison provides no cite for that proposition.

The Court agrees that after *Barnstable*, Title IX clearly does not preclude §1983 suits based on equal protection violations. But *Barnstable* did not involve retaliation claims, which is the §1983 claim remaining here.[2] Plaintiff did not cite and the Court could not find any published Ninth Circuit Court of Appeals opinions allowing for a retaliation claim under the Equal Protection Clause. Published opinions from other Circuits, however, specifically hold that no such claim exists. *See, e.g., Thomas v. Independence Township*, 463 F.3d 285, 298 n.6 (3rd Cir. 2006)("However, a pure or generic retaliation claim simply does not implicate the Equal Protection Clause); *Maldonado v. City of Altus*, 433 F.3d 1294, 1308 (10th Cir. 2006)("To the extent that Plaintiffs raise their retaliation claim under 42 U.S.C. §1983, asserting violations of equal protection, we have long held that such a theory of liability for retaliatory conduct does not come within §1983), overruled on other grounds by *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006); *Ratliff v. Dekalb County, Georgia*, 62 F.3d 338, 340 (11th Cir. 1995)("[N]o clearly established right exists under the equal protection clause to be free from retaliation.").

Because Plaintiff has not provided the Court with any legal basis for a retaliation

---

[2]The Court notes that Plaintiff perhaps could have survived this Motion on her §1983 equal protection discrimination claim against Mr. Gonzales and/or a First Amendment retaliation claim against the Defendant, but she did not preserve those claims in her Response to the Motion.

- 11 -

claim under the Equal Protection Clause, the only §1983 claim she did not abandon in her Response to the Motion for Summary Judgment, the Court will grant summary judgment to all Defendants on Plaintiff's §1983 claim.

Accordingly,

IT IS ORDERED Granting Defendants' Motion for Summary Judgment (Doc. #79).

DATED this 21st day of December, 2009.

_____
James A. Teilborg
United States District Judge